## KOZLOWSKI v. ROCHESTER, S. & E. R. CO.

(Supreme Court, Appellate Division, Fourth Department.    January 11, 1911.)

1. RAILROADS (§ 274*)—OPERATION—INJURIES TO LICENSEES.

Running an electric car, not intended for stops at local stations, at a high rate of speed in passing a local station where a person waiting to take passage stood so near the track as to be within 20 inches of the car as it passed, was not negligence warranting recovery for resulting injury to such person.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 868–872; Dec. Dig. § 274.*]

2. RAILROADS (§ 278*)—OPERATION — INJURY TO LICENSEES — CONTRIBUTORY NEGLIGENCE.

Where one wishing to take passage on an electric car at a local station stood on the platform so near the track that the car passed within 20 inches of him, and he could see the car approaching at least 1,200 feet, and knew that it was coming very rapidly and without any slackening of speed, his own lack of caution contributed to his injuries caused by the wind as the car passed.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 891–900; Dec. Dig. § 278.*]

Appeal from Trial Term, Monroe County.

Action by Anthony Kozlowski against the Rochester, Syracuse & Eastern Railroad Company. From a judgment for plaintiff for $1,-134.24 damages and costs on a verdict, and, from an order denying a new trial on the minutes, defendant appeals. Reversed, and new trial granted.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Ernest I. Edgcomb, for appellant.

Edward C. Edelman, for respondent.

SPRING, J. The action is negligence. The defendant is a street surface railroad company operating a double-track railroad by electricity from Rochester to Syracuse, a distance of 81 miles. The tracks are built in the main upon the defendant's right of way, and both limited and local cars are in use, the former running at a high rate of speed making very few stops. At each highway crossing a small building called a "shelter," with a platform extending nearly to the adjacent track, had been constructed for the accommodation of passengers desiring to take its local cars. In the building was a device to be used in signaling the local cars to stop. The tracks extended in an easterly and westerly direction, and the west-bound cars ran on the northerly track. Station 17 was in the country a few feet east of the highway crossing and east of the village of Fairport through which defendant's tracks extended. The shelter at this station was north of the tracks and distant from the nearest rail about 12 feet. The platform was of planks, each one foot in width, practically level with the tracks and about 16 feet parallel with them and extending to within 2 feet 7 inches of the northerly rail, and the intervening space was filled in with gravel. The overhang of the car, which,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

126 N.Y.S.—39

it is claimed, caused the injuries to the plaintiff, was 1 foot 8¼. inches, so that the distance between the outer line of the car and the southerly edge of the platform was 10¾ inches, which distance was reduced to 10 inches by reason of the projecting journal boxes. of the car. No tickets were sold at this station, and no one was in charge. It was designed as a shelter for waiting passengers, and to enable them to signal approaching cars. The track toward the east was straight for 1,200 feet and an approaching car from that direction could be readily seen for that distance by a person standing on the southerly part of the platform, and still further away at the shelter.

On the afternoon of the 8th of August, 1908, the plaintiff and a fellow countryman left Rochester over the defendant's line and stopped at station 17 to visit a friend in that vicinity. They returned to the station about 11 o'clock in the evening, and waited in the shelter for the car to Rochester. They heard the whistle on a car from the east, and through the window in the shelter saw it approaching nearly 1,600 feet distant. They observed the signaling device, but did not understand its purpose. They walked out to the edge of the platform, intending to board the car. The plaintiff stood on the second plank from the track, watched the coming car, and waved his hand for it to stop. It was in his view all the time, and was coming rapidly. He testified it was 17 seconds coming the 1,200 feet, which, of course, was a mere guess. There is, however, no other evidence as to the exact rate of speed, and it may be assumed that it was about 48 miles an hour. He testified:

"When I got out of the shelter, I took my position about a foot from the edge of the platform. I stood on the second board from the edge of the platform. I looked in the direction of the approaching car. As I got out on the platform and stood there, I saw the reflection from the car, then I saw it coming around the curve, and then saw the headlight of the car approaching, and, as it came straight along to me, I waved my hand for it to stop. I believed at that time that the car would stop in response to my signal. As the car got within about eight feet of me the glare of the light struck my eyes and I was dazed, and the wind immediately hit me. I felt as if the wind lifted me in the air. I don't remember what happened to me."

And again on cross-examination:

"I did not have any difficulty in seeing the car. I think it was coming very fast. It didn't slacken its speed a particle from the time I first saw it until it reached me. The whistle did not blow again after it blew for this stop. I did not step back when I saw this car coming toward me. I had no time. There was no one on this planking, except John and myself."

And further:

"When the car was eight feet from me, the light struck me in the face. Immediately afterward I felt this sensation of being lifted off my feet. The light struck me, and immediately the car struck me. I didn't know how far the car was away from me. The car was near me when I felt the sensation of being lifted off my feet. When the light struck me, the car was about eight feet away. I don't know how far it was away when the wind struck me, but I think it must have been nearer. It was cloudy that night, because it was rather dark outdoors. It was dark. It was a dark night. I don't remember whether it was cloudy or not."

The companion of the plaintiff corroborated him in the essentials. Neither testified precisely the manner in which the accident happened.

Kubasiewiez, the man with the plaintiff, testified that the car did not slow down at the station, and added:

"I jumped back, and the wind took hold of me, and the car passed by me, and then I saw Tony lying on the ground."

However the catastrophe occurred, the plaintiff was seriously injured and his right leg was amputated below the knee.

The motorman on the car was sworn as a witness on behalf of the plaintiff, and testified that the car was a limited car running as an extra from Lyons, and was without passengers at the time he passed station 17. It appears that the people of Fairport were observing "Old Home Week" at this time and many people were attracted to this function, and extra cars were used for their accommodation, and this was one of these cars, and it was not running on schedule time and the orders were not to stop, except at Newark. It was a heavy car, weighing about 48 tons and was 52½ feet in length. The motorman testified that he did not see any one on the platform at station 17, and did not know of the accident until he arrived at Fairport.

While the story of the plaintiff as to the manner of the accident seems to be incredible, yet, assuming it be truthful, it establishes no actionable negligence on the part of the defendant. The place was in a country district and on the defendant's right of way. The car was intended to run rapidly, and not to stop at stations in the country. If these cars are to be operated at all and in competition with cars propelled by the use of steam, a high rate of speed is necessary. A fast railroad train passing a local station is not required to slow down unless there is something to indicate to the engineer it is prudent to do so. If two or three people are standing on the platform, he is not to assume that they will step in front of the train or approach dangerously near it. The same rule should obtain in the operation of rapidly running cars on a street surface railroad. Even if the motorman saw the plaintiff and his companion, or if vigilant he should have seen them, their presence on the platform would not suggest that they were in any danger from the car. The plaintiff was on the second plank from the track, and more than 20 inches from the extreme overhang of the car. He was looking at the car, and the motorman would be warranted in believing he would step back as it approached. It was not negligent in the circumstances to run the car rapidly. Phelps v. Erie R. R. Co., 134 App. Div. 729, 119 N. Y. Supp. 141; Hunt v. Fitchburg R. R. Co., 22 App. Div. 212, 47 N. Y. Supp. 1034. The plaintiff's story proves that his own lack of caution contributed to his injuries. Riddle v. Forty-Second St., etc., R. R. Co., 173 N. Y. 327, 331, 66 N. E. 22; Dooley v. Union Railway Co., 106 App. Div. 397, 94 N. Y. Supp. 635; Creenan v. International R. R. Co., 139 App. Div. 863, 124 N. Y. Supp. 360; Waters v. United Traction Co., 114 App. Div. 275, 99 N. Y. Supp. 763; Matulewicz v. Metropolitan St. R. R. Co., 107 App. Div. 230, 95 N. Y. Supp. 7; Garvey v. Rhode Island Co., 26 R. I. 80, 82, 58 Atl. 456. The car was in the plain view of the plaintiff for at least 1,200 feet. He knew that it was coming very rapidly and without any slackening of its speed. There was no indication that it was to stop.

His signals received no response or recognition. He kept his position unchanged, when a step back would have placed him beyond the possibility of danger.

The judgment should be reversed.

Judgment and order reversed, and a new trial granted, with costs to the appellant to abide event. All concur.

